UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

           Plaintiff,

v.

CARLOS TORRES,
JESSIE MCINTYRE,
FREDERICK ROLLE,
ONEL MEDINA-SOSA,

           Defendants.

DECISION & ORDER and
REPORT & RECOMMENDATION

05-CR-6062L

---

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated May 6, 2005, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 14).

Defendants Carlos Torres, Jessie McIntyre, Frederick Rolle and Onel Medina-Sosa are charged with conspiring to possess with intent to distribute, and to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. § 846.  (Docket # 7).  Defendant Carlos Torres is also charged with possessing a firearm in furtherance of that offense, in violation of 18 U.S.C. § 924(c)(1).  Both of the charged offenses allegedly occurred on or about April 20, 2005. (Docket # 7).

On March 2, 2006, at a status conference before this Court, the government represented that it has decided not to pursue the charges against McIntyre and will be taking steps

to discontinue the prosecution against him.  As of today (March 3, 2006), the government has not

yet filed a motion under Rule 48(a) of the Federal Rules of Criminal Procedure to dismiss the

indictment against McIntyre.

Currently pending before this Court for a Decision and Order is defendant

Torres's motion for the disclosure of the identity of the government's confidential informant.

(Docket # 41).  Before the Court for Report and Recommendation are motions by defendants

Medina-Sosa and Torres to suppress tangible evidence and by Medina-Sosa to suppress

statements.  (Docket ## 26, 41, 85, 88).[1]  The following constitutes this Court's Decision and

Order and Report and Recommendation on defendants' motions.


## FACTUAL BACKGROUND

The factual background relating to defendants' motions to suppress was presented

to this Court in three different ways.  First, this Court has reviewed a search warrant and

supporting affidavits for the residence at 735 Parsells Avenue and a 1994 Ford Bronco.  (Docket

# 41, Ex. B; # 88, Ex. C).  Second, a suppression hearing was conducted on September 8, 2005.

(Docket ## 70, 80).  Finally, this Court also conducted a *Franks* hearing on August 31, 2005.

(Docket ## 67, 73).

---

[1] Defendants' omnibus motions also sought, *inter alia*, a bill of particulars, *Brady* material, a conspiracy hearing, discovery and inspection, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, *Jencks* material, preservation of rough notes, severance and inspection of the jury lists.  Each of these requests was either resolved by the parties or decided in open court by the undersigned on July 22 and August 17, 2005.  (Docket ## 52, 56, 64, 65).

2

I.  **Search Warrant Applications**

In support of their motions to suppress, defendants have submitted for this Court's review the search warrant for 735 Parsells Avenue issued by Rochester City Court Judge Ellen M. Yacknin, as well as the affidavit submitted in support of such warrant by Officer Robinson Aponte of the Rochester Police Department.  (Docket # 41, Ex. B).  Defendants have also submitted the warrant and Aponte's supporting affidavit for Medina-Sosa's Ford Bronco. (Docket # 41, Ex. C).

A.  **Search Warrant for 735 Parsells Avenue:**  On April 20, 2005, Judge Yacknin authorized a search of 735 Parsells Avenue for, *inter alia*, cocaine, cocaine paraphernalia, records and proceeds of cocaine trafficking and firearms.  (Docket # 41, Ex. B). In Officer Aponte's supporting affidavit ("Residence Aff."), he affirmed that on April 20, 2005, officers of the Rochester Police Department received information from a private citizen concerning a white Oldsmobile, bearing New York license plate number CZY-3331, that had been parked in front of his house on several occasions.  The citizen informed the officers that he had observed young males exit the car, walk through the yards of other houses and enter a house located on "the next street over."  (Residence Aff. at 3).[2]  On some occasions, the citizen reported, the men carried bags with them into the house; on other occasions, they carried bags out of the house.  (Residence Aff. at 3).

At the same time as the citizen was reporting the information to the officers (who were apparently in the vicinity of the citizen's home), the officers observed the white Oldsmobile

_____

[2]  References to Aponte's affidavit are to the pages of the affidavit because the paragraphs are not separately numbered.

3

identified by the citizen drive past them.  The officers followed the Oldsmobile in their patrol

car, activated their emergency lights and attempted to conduct a traffic stop.  Instead of stopping,

the Oldsmobile accelerated and drove on at a high rate of speed, eventually driving through a

fence at the end of a residential driveway and coming to rest in the backyard.  The driver, later

identified as defendant Frederick Rolle, exited the vehicle and fled on foot through the

neighborhood.  Rolle was apprehended by the officers, handcuffed, and returned to the yard in

which the Oldsmobile had come to rest.  (Residence Aff. at 3).

A records check revealed that Rolle's driving privileges had been suspended, and

he was ticketed for various traffic infractions.  A tow truck was called to the scene because the

Oldsmobile had sustained extensive damage, making it unfit to operate.  (Residence Aff. at 3).

Before the car was towed, however, Officer Vasquez conducted an inventory search of the

Oldsmobile to ensure the safety of any valuables in the vehicle.  During the search, Vasquez

observed a backpack in the vehicle, inside of which he discovered five kilograms of cocaine.

(Residence Aff. at 3).

Rolle was then transported to the Monroe County Public Safety Building, where

he was interviewed by Officer Aponte.  After introducing himself to Rolle, Aponte advised him

of his *Miranda* warnings, and Rolle agreed to speak with him.  (Residence Aff. at 3).  Rolle

stated that earlier in the day, Jessie McIntyre had picked him up in the white Oldsmobile and had

informed him that he had "kilos" of cocaine that he wanted Rolle to deliver to 378 Alphonse

Street.  Rolle admitted that he had made similar deliveries for McIntyre on approximately four

previous occasions.  On those previous occasions, Rolle stated, he accompanied McIntyre to a

house on Parsells Avenue to obtain the cocaine, which was later stored at 378 Alphonse Street.

4

As recently as the preceding Friday, Rolle accompanied McIntyre to the Parsells Avenue residence to deliver cash to a Hispanic male as payment for a previous purchase of cocaine. (Residence Aff. at 4).

Although Rolle did not know the exact address of the Parsells Avenue residence, he described it as a yellow house, "just short of" Merchants Road in Rochester, with a wire fence in front and a wooden fence along the side.  He also indicated that a red pick-up truck and a "bluish-gray" Humvee were usually parked in the driveway.  Using Rolle's description, officers went to Parsells Avenue and identified 735 Parsells Avenue as the location that matched Rolle's description.  (Residence Aff. at 4).

Aponte further affirmed that on the day he applied for the search warrant, he had a conversation with Officer Sindoni, who informed him that a confidential informant working with him had visited 735 Parsells Avenue the previous week and had observed two kilograms of cocaine, empty kilogram wrappers and a large amount of currency in the basement of the house. (Residence Aff. at 4).

**B.  Search Warrant for Ford Bronco:**  On the same day that officers executed the search warrant for 735 Parsells Avenue, Rochester City Court Judge John Elliott authorized a search of a 1994 Ford Bronco that was parked in the driveway.  As with the warrant for the residence, the warrant for the vehicle was issued upon a supporting affidavit submitted by Aponte ("Bronco Aff.").  (Docket # 88, Ex. C).

In his affidavit, Aponte affirmed that while executing the search warrant for 735 Parsells Avenue, officers had observed a black Ford Bronco occupied by a Hispanic male parked in the driveway.  (Bronco Aff. at 3).  The searching officers detained the male for questioning as

the search of 735 Parsells Avenue was conducted.  A narcotics detection dog was called to the residence to search for narcotics.[3]  While searching the house, the dog alerted to a gray coat in which a large amount of currency was discovered.  The dog was then directed to search the Ford Bronco in the driveway.  As the dog approached the front door of the vehicle, he began to bark aggressively, indicating the presence of narcotics.  (Bronco Aff. at 3).

According to Aponte, the driver of the vehicle, who was the registered owner of the Bronco, consented to permit the officers to search the Bronco.  During the search, Aponte observed a hidden trap or compartment in the rear passenger area of the vehicle.  Based upon his training and experience, Aponte opined that such compartment was similar to those used by persons involved in trafficking large quantities of narcotics, weapons or currency.  After discovering the hidden compartment, Aponte discontinued the search of the Bronco and applied for a search warrant.  (Bronco Aff. at 3).

## II.  Suppression Hearing

This Court conducted a suppression hearing on September 8, 2005, relating to Medina-Sosa's suppression motions.[4]  During the hearing, the government presented the testimony of Officers Aponte, Philip Sindoni and Joe Celorio of the Rochester Police Department

---

[3]  The affidavit identifies the house number to which the dog was summoned as "753."  Based upon the inclusion of several other references to "735" in the affidavit and the fact that the earlier warrant had issued for 735 Parsells Avenue, the reference to "753" appears to be a transcriptional error.

[4]  The transcript of the suppression hearing conducted before this Court on September 8, 2005, shall hereinafter be referenced as "Tr.B __."  (Docket # 80).

and Sergeant John Henderson of the Greece Police Department.[5]  (Docket ## 70, 80).  The

testimony offered by the various officers was consistent in many respects and credible.  Based

upon that testimony, this Court finds the following.

On April 20, 2005, Sergeant Henderson advised Officer Aponte that uniformed

patrol officers had arrested Rolle and had confiscated approximately five kilograms of cocaine.

Aponte thereafter interviewed Rolle at the Monroe County Public Safety Building.  (Tr.B 96).

During the interview, Rolle indicated that on previous occasions, he had retrieved cocaine and

had delivered narcotics proceeds to a house on Parsells Avenue.  Although Rolle did not know

the exact address, he described the house and the vehicles located in the driveway.  (Tr.B 96-97).

Following the interview, Aponte advised Henderson that Rolle had identified a

house on Parsells Avenue as the location from which the cocaine had been obtained.  In

response, Henderson directed Officer Santell and other officers to Parsells Avenue to determine

whether they could identify the house.  Santell thereafter reported to Henderson that the residence

at 735 Parsells Avenue fit the description provided by Rolle.  (Tr.B 35-36).

Henderson returned to the police station and entered the address into a database

known as the "case tracking system," which allows an officer to enter an address to determine

whether any other officer has an open investigation relating to that address.  Upon entering 735

Parsells Avenue, Henderson learned that that address was the subject of an investigation by

Officer Sindoni.  (Tr.B 37-39, 41; G.Ex. 4).  The system specifically identified the target of the

---

[5] Henderson was assigned to the Greater Rochester Area Narcotics Enforcement Team on April 20, 2005. (Tr.B 33-34).

investigation as Carlos Torres and included an entry by Sindoni noting, "Target lives here and stores weight here." (Tr.B 39; G.Ex. 4).[6]

      After reviewing the database information, Henderson called Sindoni to inquire about his investigation into 735 Parsells Avenue. (Tr.B 42). Sindoni informed him that he had been provided information about 735 Parsells Avenue by a confidential informant. (Tr.B 17-18). As he testified, the confidential informant was an individual with whom Sindoni had worked for approximately five years. During that time, the informant provided information that had led to at least ten arrests of suspected narcotics traffickers and at least twelve criminal convictions. (Tr.B 14-15). The informant also had previously provided information upon which search warrants had issued, resulting in the seizure of narcotics, firearms and currency. (Tr.B 15-16).

      Sindoni reported to Henderson that a week or two earlier his informant had advised him that Carlos Torres, who lived at 735 Parsells Avenue and owned a karate business on North Goodman Street, was a narcotics dealer who dealt in kilogram quantities of cocaine. The informant further reported that several weeks earlier he had observed large amounts of cocaine, cash, cocaine wrappers and a German shepherd dog at 735 Parsells Avenue. (Tr.B 12-13, 17-18, 20). Sindoni also told Henderson that the informant had advised him of an expected shipment of a large amount of cocaine, which was to be transported in a black Ford Bronco driven by a Dominican male. (Tr.B 14). Sindoni further informed Henderson that he had observed a Ford Bronco parked at 735 Parsells Avenue approximately one or two weeks earlier.

---

[6] Henderson testified that G.Ex. 4 is a photograph of the case tracking system file for 735 Parsells Avenue as it existed at the time of the suppression hearing. Henderson testified that the information was slightly different when he viewed the file on April 20, 2005. For example, G.Ex 4 identifies Aponte as the investigating officer; when Henderson originally ran the report for 735 Parsells Avenue on April 20, 2005, the case tracking system identified Officer Sindoni as the investigating officer. (Tr.B 41). Significantly, Henderson testified that the target name and narrative entry described above were present when he viewed the file on April 20, 2005. (Tr.B 41).

(Tr.B 16-17).  Sindoni recalled that the Bronco bore a New York State license plate that was registered to the name "Onel" at an address on Wilkens Street.  (Tr.B 20).

After his conversation with Sindoni, Henderson was advised by Officer Santell that he and other officers conducting surveillance of 735 Parsells Avenue had observed a black Ford Bronco pull into the driveway of the residence.  Henderson then advised Santell about the information he learned from Sindoni about a black Ford Bronco.  (Tr.B 44).

Based upon the foregoing information,[7] Aponte submitted an application for a search warrant for 735 Parsells Avenue, which was issued by Judge Yacknin.  When the searching officers arrived to execute the warrant, the black Ford Bronco was still parked in the driveway.  Onel Medina-Sosa, who was in the driver's seat watching a video, was detained and escorted to the front porch of the house while the search was initiated.  (Tr.B 45-46, 66, 82). After approximately fifteen minutes, Officer Celorio, who had been participating in the search of the residence, was directed to talk to Medina-Sosa because Celorio spoke Spanish and Medina-Sosa appeared to speak only Spanish.  (Tr.B 66-67).  Celorio asked Medina-Sosa for his name and whether he was the owner of the Ford Bronco.  Medina-Sosa indicated that the vehicle was his.  Celorio then asked Medina-Sosa for permission to search the Bronco, and Medina-Sosa responded, "Yes, of course."  (Tr.B 68-69).  After obtaining Medina-Sosa's consent to search the Bronco, Celorio walked off the front porch and informed the other officers that they had permission to search, at which point they began to search the car.  (Tr.B 70).

---

[7] At the conclusion of Henderson's conversation with Sindoni, Henderson arranged for Sindoni to speak to Aponte because Aponte was preparing a search warrant for 735 Parsells Avenue.  (Tr.B 43-44).

During the search, officers discovered a possible hidden compartment underneath the rear seat and advised Aponte of their discovery.  When Aponte inspected the Bronco, he observed that the rear seat had been pulled forward and that the metal floor underneath the seat appeared to be higher than normal, suggesting that a hidden compartment might be present. (Tr.B 101).  Upon further inspection, Aponte observed a hole in the metal floorboard with jagged metal edges, inside of which was an item that appeared to be bound with black electrical tape. (Tr.B 102; G.Ex. 3).  Aponte was able to reach in and touch the item, but could not remove it. (Tr.B 103).  Based upon his observations, as well as his training and experience, Aponte opined that the item was cocaine.  (Tr.B 106).

At that point, Aponte suspended the search of the Bronco, notified Henderson of the suspected hidden compartment and informed him that he wished to apply for a search warrant.  (Tr.B 106).  A narcotics detection dog was then called to the scene and directed to inspect the Bronco.  The dog walked around the vehicle and began to bark aggressively at the front of the Bronco, indicating the presence of narcotics.  (Tr.B 108).

When the search of 735 Parsells Avenue concluded, Medina-Sosa and the Bronco were transported to the Monroe County Public Safety Building.  (Tr.B 110).  In the meanwhile, Aponte applied for a search warrant to search the Bronco, which was issued by Judge Elliott. During the subsequent search of the hidden compartment in the Bronco, Aponte discovered twelve kilograms of cocaine wrapped in black electrical tape.  (Tr.B 112).

Approximately three hours after Medina-Sosa was transported to the Public Safety Building, Celorio spoke with Medina-Sosa for a second time in an interview room at that building.  (Tr.B 70-72).  Celorio was accompanied by Officer Edward Torres, who also speaks

10

Spanish.  (Tr.B 72-73).  Celorio initially informed Medina-Sosa that he was being detained

pursuant to an investigation.  He then advised Medina-Sosa of his *Miranda* warnings by reading

them verbatim from a Spanish *Miranda* form, as Medina-Sosa read along.  (Tr.B 73, 77; G.Ex.

1).  Specifically, Celorio advised Medina-Sosa in Spanish:

> You have the right to stay silent.  You don't have to say anything,
> if you don't want to.  Anything that you do say can be used against
> you in a penal court law.  You have the right to consult with an
> attorney before any – before you answer any questions, and you
> have the right to have him with you here present.  If you cannot pay
> for the services of a lawyer, one will be provided before any
> interview, if that's the way you desire it.  If you decide to talk with
> me, you can stop talking at any moment.

(Tr.B 75).  After advising Medina-Sosa of his rights, Celorio asked him, "Did you understand

what I have just told you?" Medina-Sosa responded "Si" (yes), as he did to the question "would

[you] like to give up your rights and talk to me now?"  (Tr.B 76-77).

Celorio then interviewed Medina-Sosa for the next fifty or sixty minutes.  (Tr.B

78).  At no time during the interview did Medina-Sosa indicate that he wanted to speak with a

lawyer.  (Tr.B 78).  The interview concluded because Medina-Sosa stated that he wanted to stop

talking because he was scared for his family in the Dominican Republic.  (Tr.B 78-79).  Medina-

Sosa refused to sign a written statement, reiterating his fear for his family if he did so.  (Tr.B 87).

### III.  Franks Hearing

On April 20, 2005, Aponte was advised by uniformed officers that Rolle had been

arrested while carrying approximately five kilograms of cocaine in a car.  Aponte directed the

officers to transport Rolle and the vehicle to the Monroe County Public Safety Building.  (Tr.A 4).[8]

At the Public Safety Building, Aponte introduced himself to Rolle and asked Rolle whether he would explain the circumstances of his arrest, which Rolle agreed to do.  (Tr.A 5).  Before allowing Rolle to speak, Aponte advised him of his *Miranda* rights by reading the rights from a form.  Rolle indicated that he understood his rights and agreed to speak with Aponte.  (Tr.A 5).  Aponte further explained that he would record the substance of Rolle's statement in writing and would allow Rolle to review the written statement and make corrections to it at the end of the interview.  (Tr.A 5-6).

Initially, Rolle recounted that he had gone to a house on Parsells Avenue to pick up narcotics.  (Tr.A 22).  After approximately two minutes, Rolle exclaimed, in sum and substance, "F_ _ _ this, I'm not going to lie for anyone, I'm not going to go to jail for anyone, I'm going to tell you exactly what happened."  (Tr.A 6).  At this point, Aponte marked an asterisk on the top of the form he had been using to record Rolle's statement and noted, "Statement originally given by Frederick and then recanted."  (Tr.A 8; G.Ex. 1).  Aponte then took out a clean sheet of paper and began preparing a new statement.  (Tr.A 8; G.Ex. 2).

During the ensuing interview, Rolle stated that the drugs that were in the car that he was driving at the time of his arrest had been picked up by Jessie McIntyre and were intended to be delivered to 378 Alphonse Street.  According to Rolle, McIntyre always obtained his kilograms of cocaine from a house on Parsells Avenue that belonged to a Hispanic male known

---

[8]  The transcript of the *Franks* hearing conducted before this Court on August 31, 2005, shall hereinafter be referenced as "Tr.A __."  (Docket # 73).

as "Papi."  Rolle described the house as yellow with a wire fence in front and a wooden fence on

the side.  Finally, Rolle stated that a red pick-up truck was usually parked in the driveway,

sometimes accompanied by a "bluish-gray" Humvee.  (Tr.A 12; G.Ex. 2).  Although he did not

include it in the written statement, Aponte recalled that Rolle also stated that a German shepherd

lived in the house and that there was a silver refrigerator in the house that caught his attention.

(Tr.A 13).  When the written statement was complete, Aponte provided it to Rolle and asked him

to make any changes he thought were necessary and, if he agreed with the statement, to sign it.

Rolle appeared to read the statement and then signed it at the bottom.  (Tr.A 11).

After Rolle signed the statement, Aponte called Henderson and advised him of the

information provided by Rolle.  (Tr.A 11-12).  Henderson then directed Officer Santell to

Parsells Avenue in order to attempt to identify the house described in Rolle's statement.  (Tr.A

12).  Santell thereafter reported that he had located a house at 735 Parsells Avenue that fit the

description provided by Rolle.

After determining the address, Aponte began to draft a search warrant application.

(Tr.A 14).  Before submitting the application, Aponte also learned that Sindoni had an open

investigation on 735 Parsells Avenue.  (Tr.A 15).  Aponte then contacted Sindoni and asked him

about his investigation.  (Tr.A 15).  Sindoni advised him that a confidential informant had

informed him that 735 Parsells Avenue was a drug location where the informant had personally

observed several kilograms of cocaine, empty kilogram wrappers and a large amount of money in

the basement.  Aponte included this information in his supporting affidavit for the search

warrant.  (Tr.A 16; G.Ex. 3).

## DECISION AND ORDER

Defendant Torres has moved for disclosure of the identity, or in the alternative for the court to conduct an *in camera* examination, of the government's confidential informant. (Docket # 41).  The government opposes the motion on the grounds that immediate disclosure would unduly compromise the safety of the confidential informant.  (Docket # 45).

The disclosure of a confidential informant's identity is within the sound discretion of the district court.  *DiBlasio v. Keane*, 932 F.2d 1038, 1042 (2d Cir. 1991).  The government generally is not required to disclose the identity of confidential informants.  *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  In order to obtain such disclosure, the defendant must show that without it, he "will be deprived of a fair trial."  *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (defendant entitled to identity of confidential informant only upon showing that it is essential or material to the defense), *cert. denied*, 489 U.S. 1089 (1989).  A defendant's mere suggestion that disclosure will be of assistance to the defense of the case is insufficient.  *United States v. Fields*, 113 F.3d at 324.  "[T]he district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity."  *Id.* (citing *Roviaro v. United States*, 353 U.S. at 62).  Such a need is established, according to the Second Circuit, "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence."  *United States v. Saa*, 859 F.2d at 1073.

14

In the instant matter, Torres has failed to show how disclosure of the informant's identity will be material to his defense. *See United States v. Flaharty*, 295 F.3d 182, 202 (2d Cir. 2002) ("speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden"). In this case, the confidential informant's role appears limited to the transmission of certain information to Officer Sindoni that was included within the search warrant application. The informant did not, for example, make any controlled purchases of narcotics from 735 Parcells Avenue or defendant Torres. (Tr.A 67).

Considering the extensive discovery provided by the government, as well as the evidence adduced during the pre-trial hearings, the nature of the prosecution against Torres is hardly unclear. To the contrary, Aponte's affidavits and the testimony presented during both the suppression and *Franks* hearings provide significant detail concerning the government's case. Specifically, Rolle was arrested after fleeing from a vehicle containing five kilograms of cocaine, which he indicated had likely been obtained from a house on Parsells Avenue. Officers thereafter identified the house described by Rolle as 735 Parsells Avenue and obtained a search warrant for it. During the search, additional evidence was seized from both the residence and a Ford Bronco parked in the driveway at the time of the search. That evidence included twelve kilograms of cocaine found in a hidden compartment in the Bronco. In addition to the physical evidence seized, the officers also obtained statements from defendants Rolle and Medina-Sosa, which have been produced to the defendants.[9]

---

[9] By letter dated February 6, 2006, the government advised defense counsel that Frederick Rolle, who had been cooperating in this matter, took and failed a lie detector test. As a result, the government represented that it will not use Rolle as a cooperating witness. Although this disclosure prompted motions by Torres and McIntyre to reopen their detention motions, no defendant has filed any additional pretrial motions or supplemented these motions as a result of the information disclosed.

On this record, I find that the government's need to protect the safety of the informant outweighs whatever benefit disclosure of the informant's identity may provide.  Thus, Torres's motion for disclosure of the identity of the government's confidential informant is denied.

**REPORT AND RECOMMENDATION**

Both Torres and Medina-Sosa have moved to suppress physical evidence seized on April 20, 2005 from the residence at 735 Parsells Avenue and from the Ford Bronco.  (Docket ## 26, 41).  Medina-Sosa has also moved to suppress statements he made during an interview at the Monroe County Public Safety Building following his arrest.  (Docket # 26).  For the following reasons, it is the recommendation of this Court that each of the motions be denied.

**I.  Suppression of Physical Evidence**

Torres moves to suppress the evidence seized from 735 Parsells Avenue and from the Ford Bronco on the grounds that the search warrant affidavits submitted by Aponte failed to establish probable cause.  (Docket # 41).  Medina-Sosa moves to suppress the evidence seized from the Ford Bronco on the grounds that his detention was unlawful and thus tainted his consent to search and that the subsequently-issued search warrant was not supported by probable cause.  (Docket # 26).

**A.  Suppression of Evidence Seized from 735 Parsells Avenue:**  According to Torres, Aponte's affidavit in support of the search warrant for 735 Parsells Avenue failed to establish probable cause for the search because it was based only upon non-credible information

16

obtained from Rolle and "second-hand" information received by another officer from a confidential informant whose reliability was not established.  (Docket # 41).  I disagree that the affidavit was wanting and find that the warrant was lawfully issued.

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for ... conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. at 238-39) (internal quotation omitted).  Moreover, "resolution of marginal cases should be determined by the preference to be afforded to warrants."  *Id.* (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

**1. Aponte's Affidavit Established Probable Cause:**  This Court has reviewed the affidavit submitted by Officer Aponte to Judge Yacknin in support of his application for the search warrant for 735 Parsells Avenue.  In that affidavit, Aponte affirmed that on April 20, 2005, police officers received information from a private citizen relating to

suspicious activity involving a white Oldsmobile.  (Residence Aff. at 3).  As those officers were talking to the citizen, they observed the white Oldsmobile drive by.  The officers attempted to conduct a traffic stop, but the Oldsmobile sped away, with the officers in pursuit.  The vehicle pulled into the driveway of a residence, drove through a fence and finally stopped in the back yard.  The driver of the Oldsmobile, later identified as Rolle, fled from the car, and was eventually apprehended and returned to the area of the Oldsmobile.  (Residence Aff. at 3).

A subsequent records check revealed that Rolle had a suspended driver's license and that the car was registered to a female owner.  Because the car had been damaged during the crash, a tow truck was called to the scene, and an inventory search was performed.  During the search, five kilograms of cocaine were discovered in a backpack in the car.  Rolle was then taken to the Public Safety Building where he was interviewed by Aponte.  (Residence Aff. at 3).

According to Aponte, after being advised of his *Miranda* rights, Rolle stated that he had been directed by Jessie McIntyre to deliver "kilos" of cocaine to 378 Alphonse Street, which he had done for McIntyre on four previous occasions.  Each time, he first accompanied McIntyre to a house on Parsells Avenue to obtain the cocaine.  Rolle further stated that on the preceding Friday, he had accompanied McIntyre to the Parsells Avenue residence to deliver cash to a Hispanic male as payment for a previous cocaine purchase.  (Residence Aff. at 4).  Although Rolle did not know the exact address of the Parsells Avenue residence, he provided a detailed description of the house, as well as the vehicles that were often parked in the driveway.  Based upon this description, officers were able to identify the house as 735 Parsells Avenue.

Finally, Aponte also affirmed that while researching the Parsells Avenue address, he learned that a confidential informant working with Officer Sindoni had been in the residence

18

and had observed two kilograms of cocaine, kilogram wrappers and a large amount of money in the basement.  (Residence Aff. at 4).

Considering this evidence, I find that unless Aponte knew that the information he provided was false or recklessly disregarded the falsity of it, his affidavit sufficiently demonstrated probable cause for the warrant.  I now turn to the question of Aponte's knowledge.

**2. Aponte Reasonably Relied Upon Available Information:**  Torres argues that Aponte's affidavit contained false and misleading information because it did not adequately disclose Rolle's incentive to fabricate or his initial statement to Aponte.  He further maintains that the affidavit was deficient because it failed to demonstrate the reliability of the confidential informant.  (Docket ## 41, 88).

Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F. 2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).  Suppression is not an automatic remedy, however; rather, suppression should be denied if the false material may be separated from the remaining content and that remaining content adequately demonstrates probable cause.  *Franks v. Delaware*, 438 U.S. at 156.

To prove falsity, the defendant must demonstrate that the affidavit submitted in support of the search warrant contained information that "the affiant knew was false or would have known was false except for his reckless disregard for the truth."  *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*, 438 U.S. at 154); *United States v. Castellanos*, 820 F. Supp.

80, 84 (S.D.N.Y. 1993).  Such proof must be by a preponderance of the evidence.  *Franks*, 438

U.S. at 156.

        Here, Torres contends that Aponte's affidavit was false and misleading because it

did not adequately disclose Rolle's motive to lie and his initial untruthfulness.  To the contrary,

Aponte's affidavit explained that Rolle was apprehended after he attempted to flee from a traffic

stop and that five kilograms of cocaine were discovered in the car from which Rolle had fled.

During the subsequent interview, Rolle stated that he was delivering the narcotics for Jessie

McIntyre, as he had done approximately four times in the past; on those four occasions, the

cocaine had been obtained from a house on Parsells Avenue.  I find that this recitation

sufficiently advised the issuing judge of the circumstances of Rolle's apprehension and

subsequent statement and the fact that he may have had a motive to minimize his culpability.

        In addition, a *Franks* hearing was conducted on August 31, 2005, during which

this Court examined Aponte's failure to reference Rolle's initial statement in his application for

the search warrant for 735 Parsells Avenue.  At this hearing, Aponte testified that he interviewed

Rolle after he had been arrested and the five kilograms of cocaine had been seized from his

vehicle.  According to Aponte, after having been advised of his *Miranda* rights, Rolle initially

began to explain that earlier in the day, he had been to a house on Parsells Avenue for the

purpose of picking up narcotics.  As Rolle was talking, Aponte was recording the statement on

paper.  (Tr.A 5-6).  Approximately two minutes after the interview started, however, Rolle stated,

in sum and substance,"F_ _ _ this, I'm not going to lie for anyone, I'm not going to go to jail for

anyone, I'm going to tell you exactly what happened."[10]  (Tr.A 6; G.Ex. 1).  Hearing Rolle's

declaration, Aponte marked an asterisk on the top of the statement form he had been using and

wrote, "Statement originally given by Frederick and recanted."  (Tr.A 8; G.Ex. 2).  At that point,

Aponte began preparing a second report of the interview, which is described *supra* at 11-13 and

was admitted at the hearing.  That statement implicated Jessie McIntyre and a male Hispanic

living in a yellow house on Parsells Avenue, later identified as 735 Parsells Avenue.

Aponte testified that he did not reference Rolle's initial statement in his affidavit

because he did not believe it was relevant.  (Tr.A 18).  Aponte explained that he did not intend to

deceive Judge Yacknin; rather, "We had just gone only a minute or two into his statement and I

didn't feel anything that he had said there would make any difference in this case."  (Tr.A 18,

20).  Moreover, Aponte testified that he obtained information corroborating the information

reflected in Rolle's second statement.  Specifically, Aponte learned that the residence at 735

Parsells Avenue was consistent with the description provided by Rolle.  (Tr.A 18-19).  More

importantly, Aponte also learned from the case tracking system that 735 Parsells Avenue was the

subject of a separate investigation by a fellow officer.  Indeed, the note entered on the case

tracking system stated, "Target lives here and stores weight here," which was consistent with

Rolle's report that he obtained kilogram quantities of cocaine from 735 Parsells Avenue.

(Residence Aff. at 3; Tr.B 39; G.Ex. 4).  Indeed, Aponte was advised by Officer Sindoni that he

worked with a confidential informant who had been inside the residence at 735 Parsells Avenue

---

[10]  Officer Aponte's written report of Rolle's initial statement did not include Rolle's assertion that he had
gone to the Parsells Avenue residence earlier in the day for the purpose of picking up cocaine.  (G.Ex. 1).  Aponte
testified that he made his report simultaneously as Rolle was speaking and did not have time to record the purpose of
Rolle's visit before Rolle made the exclamation that caused Aponte to begin recording a new statement.  (Tr.A
22-23).

and had reported observing kilogram quantities of cocaine – the same quantity identified by Rolle – empty kilogram wrappers and a large amount of cash.  (Residence Aff. at 4; Tr.B 12-13).  Although Aponte would have been better advised to have disclosed Rolle's earlier statement in the warrant application, his explanation for his decision not to do so was credible and belies Torres's contention that Aponte intentionally concealed that fact in an effort to mislead the issuing judge.

While Torres correctly notes that Aponte's affidavit did not disclose any information about the reliability of any previous information provided by the informant, the absence of such information is not fatal.  Rather, the consistency between the information provided by the informant and that provided by Rolle established an independent basis upon which to conclude that the informant's information was reliable.  *See United States v. Canfield*, 212 F.3d 713, 719-20 (2d Cir. 2000) (finding probable cause based upon information provided by informant without prior record of reliability because information was corroborated by officer's own investigation and information provided by another informant); *see also United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("it is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy[;] . . . if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration") (citations omitted).

On the record before me, I find no basis to conclude that Aponte knowingly relied upon, or recklessly disregarded, false information or that he intentionally misled the issuing judge.  *See Franks*, 438 U.S. at 171 ("[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant");

*United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995) (defendant not entitled to *Franks*

hearing based upon showing that informant knowingly or recklessly made false statement to

affiant as long as affiant in good faith represented what the informant said), *cert. denied*, 517

U.S. 1187 (1996); *United States v. Hennings*, 1997 WL 714250, *6 (W.D.N.Y. 1997) (rejecting

motion for *Franks* hearing based upon assertion that confidential informant had not provided a

truthful report because "an attack on the informant's statements is permitted only for the purpose

of demonstrating misstatements made by the government").  In my view, Aponte's affidavit

adequately demonstrated probable cause for the warrant, and the warrant properly issued.

       **3. Evidence Admissible Pursuant to Good Faith Exception:**  Moreover,

even if probable cause did not exist to justify the issuance of a search warrant, nothing in the

record suggests that the searching officers did not rely upon the warrant in good faith.  In *United*

*States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment

exclusionary rule should not be applied to evidence obtained by a police officer whose reliance

on a search warrant issued by a neutral magistrate was based on "objective good faith," even

though the warrant itself might ultimately be found to be defective.  *Id.* at 918-23; *United States*

*v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v.*

*Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000).  The rationale underlying this good-faith

exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter

objectively reasonable law enforcement activity."  *Leon*, 468 U.S. at 919.

       The Court in *Leon* identified four situations in which the good faith exception is

inapplicable.  Specifically, an executing officer's reliance on a search warrant will not be deemed

to have been in good faith:

(1) where the issuing magistrate had been knowingly misled;

(2) where the issuing magistrate wholly abandoned his or her judicial role;

(3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and

(4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* at 923.  *See United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).

Here, as described above, I find that Aponte did not knowingly mislead Judge Yacknin, nor is there any evidence to suggest that the Judge wholly abandoned her role as a judicial officer.  Moreover, as also stated, Aponte's affidavit set forth a detailed description of his investigation of narcotics activities relating to 735 Parsells Avenue.  Thus, it simply cannot be said that the search warrant application was so lacking in probable cause as to render the executing officer's reliance upon it unreasonable.  Finally, the search warrant was not so facially deficient that it would have been unreasonable for the searching officers to rely upon it. Accordingly, even if the search warrant for 735 Parsells Avenue was not supported by probable cause, Torres's motion to suppress the evidence seized from his residence should also be denied under the *Leon* good-faith exception.

B. **Suppression of Evidence Seized from the Ford Bronco**:  Torres and Medina-Sosa each seek to suppress the cocaine seized from the Ford Bronco on the grounds that Medina-Sosa's consent to search the vehicle was involuntary and that the search warrant was

unsupported by probable cause.[11]  (Docket ## 26, 41).  The government opposes such motions, arguing that Torres lacks standing to challenge the search of the Bronco and that search was lawful in any event.  (Docket ## 45, 95).

          **1. Standing:**  A defendant seeking to suppress evidence must demonstrate by a preponderance of the evidence that he had a reasonable expectation of privacy in the location or items searched.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993); *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991).  This expectation of privacy must be both subjectively and objectively reasonable – that is, the defendant must have a subjective expectation of privacy and that expectation must be one that is deemed objectively reasonable by society at large.  *United States v. Fields*, 113 F.3d at 320; *United States v. Osorio*, 949 F.2d at 40.  Courts generally evaluate standing by considering "whether the defendant had any property or possessory interest in the place searched or the items seized."  *Id.* (citations omitted).

          As noted above, the burden of establishing standing falls squarely upon the defendant.  *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).  This burden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge.  A defendant's unsworn assertion of the Government's representations does not meet this burden."  *United States v. Montoya-Escheverria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted).

---

[11]  Torres has also moved to suppress the evidence seized from the Bronco on the grounds that the search of the vehicle was the unlawful fruit of the invalid search warrant for 735 Parsells Avenue.  Because I find, for the reasons addressed above, that the search warrant for 735 Parsells Avenue was supported by probable cause, it is my further recommendation that Torres's motion to suppress evidence seized as the impermissible fruit of that search be denied.

The government concedes that Medina-Sosa was the owner of the Ford Bronco and does not contest his standing to challenge the search.  (Bronco Aff. at 3; Tr.B 68-69).  The government argues, however, that Torres has failed to demonstrate that he had a reasonable expectation of privacy in the Bronco merely because it was parked in his driveway.  (Docket # 45).  Torres asserts that he has standing to challenge the search because the Bronco was within the curtilage of his property and in close proximity to the entrance to his home.  (Docket ## 61, 88).

The Second Circuit has held that "driveways that are 'readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses.'"  *United States v. Reilly*, 76 F.3d 1271, 1279 (2d Cir. 1996) (quoting *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)); *see also United States v. Reyes*, 283 F.3d 446, 466-67 (2d Cir.) (no expectation of privacy in publicly visible driveway across which a chain was hung) (citing cases), *cert. denied*, 537 U.S. 822 (2002).  "Unobstructed open areas in front of a residence are not entitled to Fourth Amendment protection."  *Esmont v. City of New York*, 371 F. Supp. 2d 202, 212 (E.D.NY. 2005) (finding no expectation of privacy in front yard that was exposed to the public) (citing *United States v. Smith*, 783 F.2d 648, 652 (6th Cir. 1986)).

In this matter, the government has produced a photograph taken from the street in front of the residence at 735 Parsells Avenue on which it has depicted the location of the Bronco at the time of the search.  (Docket # 61, Ex. A).[12]  The Ford Bronco was parked in the driveway of the residence and could be observed from the street.  (Tr.B 52).  Nonetheless, Torres maintains

---

[12] Torres apparently agrees with the depiction because he has appended the photograph to his affidavit offered in support of his suppression motion and has relied upon it.  (*See* Docket # 61, ¶¶ 3-4).

that because the Bronco was parked adjacent to the door of his house, his expectation of privacy

in his residence should extend to the vehicle parked nearby.   Torres has not provided any

authority to support such an extension of his expectation of privacy.   Moreover, the factual

record does not support such a theory.   According to the suppression hearing testimony, it was

Medina-Sosa, not Torres, who was sitting in the driver's seat of the vehicle; presumably, it was

he who chose to park the Bronco in the driveway.   Thus, the fact that it was parked close to the

residence at the time of the search was apparently a coincidence and not the result of Torres's

efforts to assert or preserve some privacy interest in the Bronco.

In *United States v. Williams*, 219 F. Supp. 2d 346 (W.D.N.Y. 2002), the court

considered the identical issue and resolved it against the position Torres maintains.   In *Williams*,

the court held that the defendant lacked standing because "[t]here is no expectation of privacy in

a driveway that is exposed to the public."   *Id.* at 360 (citing *United States v. Hensel*, 699 F.2d 18

(1st Cir.), *cert. denied*, 464 U.S. 823 (1983)).   According to the court, because the defendant had

not established any type of interest in the vehicle whatsoever, he lacked the requisite expectation

of privacy necessary to challenge the search.   *Id.* at 361.   I agree with Magistrate Judge

Schroeder's reasoning in *Williams*.

Accordingly, I find that Torres has failed to demonstrate that he had a reasonable

expectation of privacy in the Ford Bronco.   It is therefore my recommendation that his motion to

suppress evidence seized from the vehicle be denied on that basis alone.   In any event, because I

also find that the search of the Bronco was lawful, his motion should be denied on the merits

even if he had the requisite standing to bring it.

**2. Initial Detention of Medina-Sosa:**  Medina-Sosa argues that suppression of the narcotics seized from the Ford Bronco is warranted because the officers lacked reasonable suspicion to approach him as he sat in the vehicle and because, after doing so, they unlawfully detained him.  (Docket ## 26, 85).  The government seeks to justify Medina-Sosa's detention under both *Michigan v. Summers*, 452 U.S. 692 (1981), and *Terry v. Ohio*, 392 U.S. 1 (1968).  (Docket #95 at 11-14).  Indeed, of the two officers who testified concerning the reason why Medina-Sosa was initially detained, one explained that it was to ensure officer safety (Tr.B 45-46) and the other explained that it was for investigative purposes (Tr.B 84).

The law is well-settled that police have the authority to detain occupants of a premises while a search warrant is being executed.  *See Michigan v. Summers*, 452 U.S. at 705 ("a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted"); *see also United States v. Fullwood*, 86 F.3d 27, 29-30 (2d Cir.) (permissible for officers to handcuff and detain defendant while they conducted a search of his premises pursuant to valid search warrant), *cert. denied*, 519 U.S. 985 (1996).  Such detention is justified in order to ensure officer safety, prevent flight in the event that incriminating evidence is discovered and facilitate the orderly completion of the search.  *Michigan v. Summers*, 452 U.S. at 702-03.

The law is equally clear that a police officer may lawfully conduct a brief stop and frisk for weapons, without probable cause, if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."  *Terry v. Ohio*, 392 U.S. at 30.  On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or

28

seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996). Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *id.* at 213, that the search or seizure did not violate the Fourth Amendment. *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

The question presented by this case is whether Medina-Sosa's initial detention for a period of fifteen minutes was justified under *Michigan v. Summers*, as a *Terry* stop, or, as some courts have found, under both rationales. *See Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995) (finding initial detention of individuals found on front doorstep of residence about to be searched pursuant to a warrant was justified under both *Michigan v. Summers* and *Terry*); *Willowby v. City of Philadelphia,* 946 F. Supp. 369 (E.D. Pa. 1996) (applying both *Michigan v. Summers* and *Terry* analysis to find that initial detention of individuals sitting on porch of house adjacent to one for which officers were executing a search warrant was justified). In the case at bar, as officers were surveilling 735 Parsells Avenue while they awaited the arrival of a search team, they observed Medina-Sosa drive the Ford Bronco into the driveway, park only ten to fifteen feet from the door, exit his vehicle and ring the doorbell to the residence. (Tr.B 44, 47, 120). When he received no response, he returned to the Bronco, apparently waiting for the resident to return. (Tr.B 120). By the time the searching officers arrived at the scene and

observed the black Ford Bronco in the driveway, they knew that a confidential informant had provided information that a substantial quantity of cocaine was expected to be delivered by a Hispanic male driving a black Ford Bronco.  (Tr.B 14).

The government relies upon *Michigan v. Summers* to justify the officers' fifteen-minute detention of Medina-Sosa on the front porch, contending that Medina-Sosa's close proximity to the door of the location to be searched warranted his detention while the search was in progress to ensure officer safety.  Indeed, one of the searching officers, Sergeant Henderson, testified that Medina-Sosa was detained to minimize any risk to the officers conducting the search.  (Tr.B 45-46).  Medina-Sosa counters that his detention was not justified under *Summers* because he was outside the premises at the time of the search.  While the officers were free to bar him from entering the house, Medina-Sosa maintains, they were not free to detain him.

Although I find this question to be a close one, I need not resolve it because I believe Medina-Sosa's relatively brief detention was justified under *Terry v. Ohio*, an alternative justification argued by the government.  Having arrived to execute a warrant to search 735 Parsells Avenue for narcotics, the officers observed a black Ford Bronco with a Hispanic male in the driver's seat parked in the driveway of the residence.  Their observations were consistent with the information they knew had been provided by a confidential informant about an expected delivery of a large quantity of narcotics to be transported by a Hispanic male in a black Ford Bronco.  Under those circumstances, it was plainly reasonable for the officers to suspect that criminal activity was afoot and to conduct a *Terry* stop in order to determine the driver's identity and whether he would consent to a search of his vehicle.  In fact, Officer Celorio who

communicated with Medina-Sosa testified that Medina-Sosa was detained for investigative purposes.  (Tr.B 84).

Of course, the officers did not immediately communicate with Medina-Sosa. Rather, they detained him for a period of fifteen minutes while they initiated the search of the house.  Considering the dangers inherent in executing a search warrant, particularly one involving allegations of substantial drug trafficking and the fact that the officers had reasonable suspicion to believe that Medina-Sosa was involved in that trafficking, I find that his relatively brief detention until the search location could be secured and the search commenced was reasonable.  Certainly, ample authority exists upholding *Terry* stops involving periods of detention longer than the fifteen minutes that Medina-Sosa was detained before he consented to the search of the Bronco.[13]  *See*, *e.g.*, *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) (finding thirty-minute detention acceptable under *Terry*); *United States v. Matos*, 2004 WL 1638193, *9 (W.D.N.Y. 2004) (investigative stop lasting thirty to forty-five minutes did not violate parameters of *Terry* stop); *United States v. Barber*, 839 F. Supp. 193, 201 n.6 (W.D.N.Y. 1993) ("defendant's 35-40 minute detention prior to his consent is not violative of the Fourth Amendment's reasonableness clause").

The reasonableness of the detention is further underscored by the fact that Medina-Sosa apparently spoke only Spanish, necessitating the use of a Spanish-speaking officer. Although the record is unclear whether other officers were present who spoke Spanish, the record

---

[13]  Although Medina-Sosa was ultimately brought to the Public Safety Building and detained for approximately three hours before he was formally arrested (Tr.B 71-72), it is only the initial fifteen-minute detention on the front porch at 735 Parsells Avenue that is the subject of this inquiry.  Although Medina-Sosa was not arrested until later in the evening, I find that probable cause to arrest him existed at the time the officers discovered the hidden compartment containing a package that Aponte believed to be cocaine in the vehicle Medina-Sosa admitted he owned.

is clear that Officer Celorio had a role to play in the initial execution of the warrant.  (Tr.B 66,

83).  I do not believe that the officers were constitutionally required to choose between

compromising their searching procedures and avoiding a minimal delay in interviewing an

individual properly subject to a *Terry* stop.

   **3. Consent to Search:**  Having found that the searching officers were

justified in detaining Medina-Sosa during the execution of the search of 735 Parsells Avenue, I

further find that he voluntarily consented to the search of the Ford Bronco.  Although the Fourth

Amendment generally requires that a police officer first obtain a warrant before conducting a

search of private property, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing

*California v. Carney*, 471 U.S. 386, 390-91 (1985)), a warrantless search is permissible if based

upon the voluntary consent of a person authorized to provide consent.  *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995),

*cert. denied*, 516 U.S. 1050 (1996).  Such consent may be given either by the owner of the

property that is to be searched, *Schneckloth v. Bustamonte*, 412 U.S. at 222, or by a third party

possessing common authority over the property.  *See United States v. Matlock*, 415 U.S. 164, 171

(1974).

   The consent need only be voluntary, that is, obtained without coercion, and the

resident need not be advised of his or her right not to consent.  *See Schneckloth*, 412 U.S. at

241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  It is the government's burden

to prove by a preponderance of the evidence that the consent was voluntary.  *United States v.*

*Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981), *cert. denied*, 454 U.S. 830 (1981).

The issue of voluntariness is to be determined based upon the totality of the circumstances. *Schneckloth,* 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994). The standard used to determine the voluntariness of an individual's consent is an objective one. *United States v. Garcia*, 56 F.3d at 423.

According to the evidence presented to this Court, Officer Celorio approached Medina-Sosa on the front porch of 735 Parsells Avenue approximately fifteen minutes after Medina-Sosa had been removed from the Bronco. Celorio, speaking Spanish, asked Medina-Sosa for his name and whether he was the owner of the vehicle. Medina-Sosa acknowledged that the Bronco belonged to him.[14] Celorio then asked whether Medina-Sosa would give his permission to search the vehicle, and Medina-Sosa responded, "Yes, of course." (Tr.B 68-69).

Celorio testified that Medina-Sosa did not appear to be in physical discomfort or pain, nor was he threatened or physically intimidated in any way. Moreover, Medina-Sosa did not appear to be under the influence of drugs or alcohol, and his answers were responsive to the questions posed of him. (Tr.B 69-70). On this record, I find that despite Medina-Sosa's conclusory assertions to the contrary, he voluntarily consented to the search of the Bronco.[15]

---

[14] The government has represented that it does not intend to introduce Medina-Sosa's statement that he was the owner of the Ford Bronco during its case-in-chief at trial. (Tr.B 125).

[15] In support of his challenge to the consent search, Medina-Sosa relies upon *United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004). Unlike Medina-Sosa, I do not find that *Isiofia* counsels in favor of suppression in this case. There, the Second Circuit affirmed the suppression of evidence obtained pursuant to a purported consent search, finding the defendant's consent was involuntary. In reaching its conclusion, the court afforded significant deference to the district court's credibility determinations, including its consideration of the defendant's affidavit in which he

**4. Probable Cause for Search Warrant:**  During the initial search of the Bronco, officers discovered what appeared to be a hidden compartment in the floor beneath the rear seat.  (Tr.B 101).  Aponte testified that upon closer inspection, he discovered a hole in the metal floorboard of the vehicle with jagged metal edges.  (Tr.B 102; G.Ex. 3).  Inside the hole, Aponte was able to touch an item that appeared to be bound with black electrical tape, but he was unable to pull the item out.  (Tr.B 103).  Aponte testified that based upon his observations, training and experience, he believed the item to be cocaine.  (Tr.B 106).  Having made that discovery, Aponte discontinued the search, and a narcotics detection dog was called to the scene. The dog alerted to the Bronco by barking aggressively, indicating that narcotics were present. (Tr.B 106-08).

At that point, Aponte applied for a search warrant and submitted his affidavit in support thereof.  In his affidavit, Aponte explained that the driver of a Bronco parked in the driveway of a residence for which a warrant was being executed had been detained and had consented to the search of the vehicle.  He further recounted that a suspected hidden compartment had been discovered during the search, which Aponte opined was similar to those used by persons involved in trafficking large quantities of narcotics, weapons or currency, and that a narcotics detection dog had alerted to the vehicle.  (Bronco Aff. at 3).

I find that the application before Judge Elliott was more than sufficient to establish probable cause for the warrant to search the Bronco.  The vehicle's presence at a

---

swore that the agents "yelled" at him and used "abusive language" and "demanded' his consent and told him 'that if [he] did not provide [his] consent, [he] would be jailed and deported and would never see [his] family again.'"  *Id*. at 232-33.  Here, Medina-Sosa has not provided any evidence to suggest that his consent to search the Bronco was the product of coercion; nor do I find that officers' testimony lacked credibility.  Instead, I find for the reasons already addressed that the government has satisfied its burden of demonstrating that Medina-Sosa's consent was voluntary.

residence for which a search warrant for narcotics had already been issued, along with an alert by a narcotics detection dog and the officer's observation of a hidden compartment that, in the officer's training and experience, looked like one utilized for narcotics trafficking, amply demonstrated probable cause to believe that evidence of narcotics activity would be discovered in the Ford Bronco.

Accordingly, it is the recommendation of this Court that the cocaine seized from the Ford Bronco should not be suppressed.

## II.  Suppression of Statements

In the final motion before this Court, Medina-Sosa seeks suppression of the statements he made during the interview at the Monroe County Public Safety Building following his arrest on April 20, 2005.  He alleges that suppression is warranted because he was not properly advised of his rights pursuant to *Miranda* and because his statements were involuntary. (Docket # 26).  The government opposes the motion, arguing that Medina-Sosa's statements are properly admissible.  (Docket ## 33, 95).

It is, of course, well-settled that statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived those rights.  *Id.* at 444.

Here, the government does not appear to contest that Medina-Sosa was in custody at the time the statements were made.[16]   The question is whether Medina-Sosa validly waived his *Miranda* rights prior to providing the statements.   To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."   *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The record before this Court, including the testimony of Officer Celorio, demonstrates that Medina-Sosa, a native Spanish-speaker, was interviewed by two Spanish-speaking officers – Celorio and Torres.   (Tr.B 66, 72-73).   Upon entering the interview room, Celorio informed Medina-Sosa that he was being detained pursuant to an investigation.   Celorio then advised Medina-Sosa of his *Miranda* rights by reading such rights from a Spanish *Miranda* form.   (Tr.B 73, 77; G.Ex. 1).   Specifically, Celorio explained to Medina-Sosa in Spanish that he had the right to remain silent and that anything he said could be used against him.   Celorio further advised that he had the right to consult an attorney and that if he could not afford an attorney, one would be provided to him.   Finally, Celorio instructed Medina-Sosa that if he decided to speak, he could stop at any time.   (Tr.B 75).   After explaining the *Miranda* rights, Celorio asked Medina-Sosa whether he understood and whether he wanted to waive his rights and speak.   Medina-Sosa responded affirmatively to each question.   (Tr.B 76-77).

---

[16]   Insofar as Medina-Sosa challenges his detention, I find that probable cause to arrest him existed upon discovery of the hidden compartment in the Ford Bronco.   *See* n.13 *supra*.

Celorio then interviewed Medina-Sosa for approximately fifty or sixty minutes. (Tr.B 78). At no time during the interview did Medina-Sosa indicate that he wanted to speak with an attorney, nor did he say anything during the interview to suggest that he did not want to speak with the officers until he advised them that he wanted to stop speaking, at which point the officers terminated the interview. (Tr.B 78). Celorio did not threaten or physically intimidate Medina-Sosa in any way. Moreover, Medina-Sosa did not appear to be in physical discomfort or pain or under the influence of drugs or alcohol, and his answers were responsive to the questions posed of him. (Tr.B 69-70). Although Medina-Sosa stuttered during the beginning of the conversation, he explained his condition to Celorio, after which they were able to communicate more effectively. (Tr.B 69). On this record, I find that Medina-Sosa knowingly and voluntarily waived his *Miranda* rights.

Similarly, I also reject Medina-Sosa's claim that his statements were made involuntarily. (Docket # 26). Statements made in violation of *Miranda* may be used by the government for impeachment purposes, even though they are inadmissible in the government's case-in-chief. *See Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978). A coerced or otherwise involuntary statement may not, however, be used for any purpose at trial. *United States v. Kaba*, 999 F.2d 47, 50 (2d Cir.) (citing *Mincey v. Arizona*, 437 U.S. at 398), *cert. denied*, 510 U.S. 1003 (1993).

In examining whether a statement was made involuntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *Id.* at 51 (quoting *United States v. Guarno*, 819 F.2d

28, 30 (2d Cir. 1987) (citations omitted)).  In this case, no evidence exits in the record to suggest

that Medina-Sosa's statements were coerced by law enforcement or otherwise involuntarily

made.  Rather, as discussed above, I find that Medina-Sosa freely and voluntarily agreed to waive

his rights and speak to law enforcement.  Accordingly, this Court recommends the denial of

Medina-Sosa's motion to suppress statements made by him on April 20, 2005.


## **CONCLUSION**

For the foregoing reasons, it is my decision and order that Torres's motion for

disclosure of the identity of the government's confidential informant **(Docket # 41)** is **DENIED**.

It is my report and recommendation that Torres's and Medina-Sosa's motions to suppress

tangible evidence **(Docket ## 26, 41)** be **DENIED**.  It is also my recommendation that Medina-

Sosa's motion to suppress statements **(Docket # 26)** be **DENIED**.

**IT IS SO ORDERED.**


                                         *s/Marian W. Payson*
                                         MARIAN W. PAYSON
                                         United States Magistrate Judge

Dated: Rochester, New York
       March   3  , 2006.


38

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[17]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_____s/Marian W. Payson_____
                    MARIAN W. PAYSON
                    United States Magistrate Judge

Dated: Rochester, New York
         March  3 , 2006.

---

[17]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).